UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:19-CR-31-CHB-HAI-6 |
| | ) | |
| v. | ) | |
| | ) | RECOMMENDED DISPOSITION |
| TIMOTHY MARROQUIN, | ) | & ORDER |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendant Timothy Marroquin ("Marroquin") was indicted in June 2019 for conspiring to distribute 500 grams or more of a mixture or substance containing methamphetamine. D.E. 1. On February 19, 2020, his codefendant Rebecca Lannan (also known as Becky Littles) moved to suppress evidence derived from a warrant-based search of her Facebook account. D.E. 74. That same state-issued warrant also targeted Marroquin's Facebook account. On February 22, Marroquin filed the motion to suppress now under consideration. D.E. 77. He argues the warrant lacked probable cause, the good-faith exception does not apply, and the warrant violated the Fourth Amendment's particularity requirement.[1] D.E. 77-1 at 1. The procedural posture is complicated, and the scope of the issues has been difficult to pin down.

## I. Background

On March 9, 2020, the government responded to both motions to suppress, and stated:

> After reviewing the evidence, the United States does not intend to use the materials derived from the Facebook search warrants . . . as direct evidence at trial. The

---

[1] Marroquin largely adopted Lannan's argument on particularity. D.E. 77-1 at 10. Neither defendant specifically identified which portions of the materials should be stricken for lack of particularity. *Id*.; D.E. 74-1 at 12. Further, the issue was never mentioned at the suppression hearing or in Marroquin's post-hearing brief. The Court considers the "particularity" argument abandoned.

Government is not, however, suggesting that it will not use Facebook materials pertaining to either Defendant derived from other sources (i.e., cooperators' Facebook Messenger accounts accessed by and through the consent of those persons). In any event, since the search warrant and the materials derived therefrom will not be used, the Defendants' motions should be denied as moot.

D.E. 82.

But Marroquin and Lannan did not agree that their motions were moot. Marroquin replied and argued that he "did not limit his motion merely to the 'search warrant and materials derived therefrom.'" D.E. 83. He argued, "The government's response raises another question: whether evidence it intends to offer—'cooperators' Facebook Messenger accounts accessed by and through the consent of those persons'—is in full or some part(s) the fruit of the unconstitutional search and seizure of Marroquin's Facebook account." *Id.* Lannan similarly sought to suppress any "fruit of the poisonous tree" derived from the Facebook searches. D.E. 85.

The government then filed a surresponse in support of its position that the motions to suppress were moot. D.E. 86. It clarified that the phrase "derived from" was meant to encompass "any evidence stemming from" the Facebook records. *Id.* Further, the government "is unaware of any such derivative evidence." *Id.*

The Court conducted a teleconference on March 17. D.E. 88. Counsel for both defendants reported they were unable to agree that their motions were moot because they could not ascertain from the existing discovery whether certain evidence was in any way derived from the Facebook searches. The Court ordered the government to provide some supplemental discovery and ordered defendants to file supplemental briefs as to whether the new discovery resolved the mootness issue. *Id.*

On March 24, Marroquin moved for disclosure of additional evidence. D.E. 92. Lannan joined the motion. D.E. 94. The government responded in opposition. D.E. 95. Lannan and

Marroquin replied.  D.E. 97, 104.  The government filed a surresponse, continuing to insist that "there were no new witnesses identified from the Facebook materials" and none of the evidence it intends to use at trial could be "fruit" of that search.  D.E. 100.  Marroquin then moved to strike the government's surresponse.  D.E. 101.  The government responded (D.E. 105), and Marroquin replied (D.E. 106).

An additional search warrant came into play during this briefing.  The March 2019 Facebook warrant application was followed in May by a warrant-based search of Lannan's residence, where Marroquin was also known to stay on occasion.  Rec. at 00:25:10-00:26:13.  The warrant materials for this search are at Docket Entry 95-1.  The residential search uncovered suspected methamphetamine, a pistol, and drug trafficking supplies.  D.E. 95-1 at 2.  The affidavit for the residential search warrant relies in part on "social media conversations," which appears to be a reference to the disputed Facebook materials.  *Id*. at 4; Rec. at 00:20:17-00:21:14.

On April 22, the Court conducted a second teleconference.  D.E. 115.  The government asserted that none of its witnesses were derived from the Facebook searches, and that the residential warrant would stand even if the reference to "social media conversations" was removed. The defense argued the government needed to build a factual record on the sequence of events in order to prove that all potential trial evidence was free from the taint of the Facebook search.

On May 7, 2020, with Marroquin's consent (D.E. 115) and as permitted by *United States v. Burke*, 345 F.3d 416, 420-26 (6th Cir. 2003), the Court conducted an evidentiary hearing by videoconference.[2]  D.E. 122.  Two witnesses testified—Kentucky State Police Detective Brian Green, who was the affiant for the Facebook and residence warrants, and DEA Special Agent Ian Dalrymple, who is the case agent on the federal prosecution.  D.E. 123.  At the end of the hearing,

---

[2] References to the audio recording of the May 7, 2020 hearing (D.E. 122) are indicated with "Rec.," followed by the elapsed time.

the defense argued that once the references to the social media conversations were excised from the affidavit in support of the residential search, the residential search was left unsupported by probable cause.  The defense also argued that two potential witnesses, identified as Witness X and Witness Z, should be excluded because the government had not proven their statements were not tainted by the Facebook materials.  The government insisted it had not conceded the Facebook warrants were invalid.  To give the parties more time to consider the scope of the remaining issues, the Court scheduled a third teleconference.

At the third teleconference on May 15, counsel for Lannan and Marroquin reported that they were in plea negotiations, and their potential guilty pleas could render the pending motions moot.  D.E. 126.  Lannan eventually withdrew her pending motions (D.E. 136) and moved for rearraignment (D.E. 137).  However, Marroquin reported that he still needed the Court "to rule on the pending motions to suppress and to disclose evidence."  D.E. 133.  He has not moved for rearraignment.  The Court ordered a final set of simultaneous briefs, which were to "define, as clearly as possible, the issues to be determined by the Court, and the parties' positions."  D.E. 138.  The final briefs were filed on June 2, 2020.  D.E. 156, 157.

## II.  The Facebook Warrants Were Invalid

### A.  Legal Standards

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures.  It provides, in relevant part, that, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  A state search warrant being challenged in a federal court must be judged by federal constitutional standards. *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016).

When determining whether an affidavit establishes probable cause, courts look only to the four corners of the affidavit; information known to the officer but not conveyed to the magistrate is irrelevant. *Abernathy*, 843 F.3d at 249. The analysis should center on "the adequacy of what the affidavit does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Dyer*, 580 F.3d 386, 391 (6th Cir. 2009) (quoting *United States v. Allen,* 211 F.3d 970, 975 (6th Cir. 2000) (*en banc*)).

In reviewing a magistrate's decision to issue a warrant, the Court must accord the magistrate's determination great deference. *Abernathy*, 843 F.3d at 250. The question is whether the magistrate had a "substantial basis" for finding the affidavit established probable cause. *United States v. Braden*, 248 F. App'x 700, 702 (6th Cir. 2007) (quoting *United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001)). And courts should review the sufficiency of the affidavit "in a commonsense, rather than hypertechnical manner." *Greene*, 250 F.3d at 479.

To properly support a warrant, the affidavit must contain "adequate supporting facts about the underlying circumstances to show that probable cause exists." *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996). These supporting facts need not be based on the direct knowledge and observations of the affiant; they may also come from hearsay information supplied by an informant. *Id*. "From whatever source, the information presented must be sufficient to allow the official to independently determine probable cause; the judge's action cannot be a mere ratification of the bare conclusions of others." *Id*.

Probable cause is defined as reasonable grounds for belief; probable cause requires more than mere suspicion, but it does not require *prima facie* proof. *Abernathy*, 843 F.3d at 249. The critical element is that there must be reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought. *Id*.

5

When the request is to search for drugs, law enforcement need only show a fair probability that the drugs will be found in a particular place. *Abernathy*, 843 F.3d at 249. Put succinctly, "Probable cause exists where there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) (quoting *Greene*, 250 F.3d at 479).

Probable cause requires a "nexus" between the place to be searched and the evidence sought. *United States v. Crawford*, 943 F.3d 297, 308 (6th Cir. 2019) (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)). "To justify a search, the circumstances must indicate why evidence of an illegal activity will be found in a 'particular place." *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015) (citation omitted). The Constitution's general "nexus" requirement

> is refined when the place is a home and the evidence drugs. "[I]n the case of drug dealers," we have observed, "evidence is likely to be found where the dealers live." *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998) (citation, internal quotations, and alteration omitted). And so a court issuing a search warrant "may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008).

*Crawford*, 943 F.3d at 308.

The "nexus" requirement also applies to searches of social media accounts. *See United States v. Propps*, No. 4:18-CR-03, 2019 WL 668465, at *3-5 (N.D. Ga. Feb. 19, 2019); *United States v. Pendergrass*, No. 1:17-CR-315-LMM-JKL, 2018 WL 7283631, at *17-18 (N.D. Ga. Sept. 11, 2018), *report and recommendation adopted*, No. 1:17-CR-315-LMM-JKL, 2019 WL 102377 (N.D. Ga. Jan. 4, 2019); *United States v. Whitt*, No. 1:17-CR-60, 2018 WL 447586, at *4-5 (S.D. Ohio Jan. 17, 2018); *United States v. Lowry*, No. 1:15-CR-43, 2015 WL 4399627, at *2 (S.D. Ohio July 17, 2015).

## B. Text of the Affidavit

The narrative in the affidavit in support of the Facebook searches states:

Affiant has been an officer in [Kentucky State Police] for a period of 16 years and the information and observations contained herein were received and made in his/her capacity as an officer thereof.

On Tuesday March 12th 2019, an undercover drug transaction was conducted using a confidential informant, which purchased approximately 57 grams of suspected crystal meth from a male subject by the name of Timothy Marroquin for the purchase price of $1100.00. It was discovered prior to the illegal drug transaction that the suspect has used and continues to use Facebook messenger as a form of communication to arrange these types of drug transactions.

Through an ongoing drug investigation, a suspect by the name of Rebecca Lannan, aka, Becky Littles has been identified as a conspirator involved in this investigation. Through information gathered during this investigation by surveillance of said subjects, prior Facebooks search warrants, and information gathered by a qualified confidential informant, Rebecca Lannan and Timothy Marroquin are conspiring to traffic in crystal meth. The two are believed to be using Facebook messenger as a means to communicate to one another when arranging drug deals, and further their illegal drug trafficking business.

D.E. 74-2 at 2. The affidavit identifies the targeted accounts as "https://www.facebook.com/beclyjl84," which has been revealed as Lannan's account, and "https://www.facebook.com/profile.php?id=100010269126319," which has been represented to the Court as Marroquin's account. The current motion seeks only to suppress fruits of the search of Marroquin's account. D.E. 77-1 at 1.[3] The affidavit was signed and the warrant issued on March 18, 2019. D.E. 74-2 at 2; D.E. 74-3 at 2. Det. Greene received the requested information from Facebook on April 1, 2019. Rec. at 00:41:30-00:41:47.

## C. Analysis

The warrant affidavit (D.E. 74-2) fails to establish probable cause to search Marroquin's Facebook account because it contains no facts linking account #100010269126319 to Marroquin.

---

[3] While Lannan habitually deleted her messages, Marroquin did not. It is Marroquin's Facebook account that includes both Lannan's and Marroquin's messages shared over Facebook Messenger. Rec. at 00:37:45-00:38:30.

The affidavit states, "It was discovered prior to the illegal drug transaction that the suspect [Marroquin] has used and continues to use Facebook messenger as a form of communication to arrange these types of drug transactions." There is then a reference to "information gathered during this investigation by . . . prior Facebooks search warrants," followed by a statement that Lannan and Marroquin "are believed to be using Facebook messenger as a means to communicate to one another when arranging drug deals." D.E. 74-2 at 2.

These relevant statements are sparse on factual specifics. There is no explanation into how "[i]t was discovered" Marroquin arranged drug deals through Facebook Messenger. There is no description of the "information gathered" through other Facebook warrants. Nor does the affidavit identify any factual basis for Det. Greene's "belie[f]" that the suspects were conspiring over Facebook Messenger. Nevertheless, the affidavit provides a strong factual basis for believing Marroquin was dealing drugs. There is additionally the weight Courts ascribe to the opinion of a 16-year police veteran.[4] The affidavit contains sufficient facts for a magistrate to make an independent assessment of probable cause. And these facts provide the magistrate a substantial basis to determine there was probable cause to believe evidence of a crime would be found on Marroquin's Facebook account.

The problem is that the affidavit provides no information suggesting that account #100010269126319 is Marroquin's account. "To establish probable cause, the affidavit must have linked [the targeted] Facebook account to the illegal conspiracy." *United States v. Propps*, No. 4:18-CR-03, 2019 WL 668465, at *3 (N.D. Ga. Feb. 19, 2019) (citing *United States v. Blake*, 868

---

[4] An issuing judge "may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 644 (6th Cir. 2003) (quoting *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996)); *see also United States v. Melton*, No. 6:18-CR-48-REW-HAI, 2019 WL 1521979, at *4 n.5 (E.D. Ky. Apr. 8, 2019).

F.3d 960 (11th Cir. 2017)). Here, as in *Whitt*, there are no *specific* averments regarding the *particular* Facebook account at issue. *United States v. Whitt*, No. 1:17-CR-60, 2018 WL 447586, at *4 (S.D. Ohio Jan. 17, 2018) (citing *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015)). Without any factual statement as to *why* Det. Greene believed this to be Marroquin's account, the issuing judge had no way to independently determine whether there was an adequate nexus between the drug trafficking and account #100010269126319.

But finding that the warrant lacked an adequate nexus does not immediately equate to suppression of the evidence. The government has stated it will not use information from Marroquin's Facebook account. But, even if the government intended to use that information as evidence at trial, suppression would not be warranted because of the "good faith" exception.

### III. The "Good Faith" Exception Prohibits Suppression of the Facebook Account

Although the warrant failed to establish probable cause due to an inadequate "nexus," the good-faith exception saves the search of Marroquin's Facebook account from the exclusionary rule.[5] The good-faith inquiry is confined to "the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Higgins*, 557 F.3d 381, 391 (6th Cir. 2009) (quoting *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)). The conclusion that the officers' reliance on the warrant was objectively reasonable requires a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause. *Id.*

The exclusionary rule serves to deter police misconduct. *Leon*, 468 U.S. at 916. Application of the exclusionary rule requires the reviewing court to balance the deterrence benefits of suppression with its heavy costs, focusing on the "flagrancy of the police misconduct" at issue.

---

[5] To be clear, the Court makes no statement concerning the validity of the search of Lannan's Facebook account or the applicability of the good-faith exception to that evidence.

*Davis v. United States*, 564 U.S. 229, 237-38 (2011) (quoting *Leon*, 468 U.S. at 909, 911).  "[T]he deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue."  *Id*. at 238 (quoting *Herring v. United States*, 555 U.S. 135, 143 (2009)).  When police act with deliberate, reckless, or grossly negligent disregard for the Fourth Amendment, "the deterrent value of exclusion is strong and tends to outweigh the resulting costs."  *Id*. (quoting *Herring*, 555 U.S. at 144).

Marroquin argues the "good faith" exception does not apply because the affidavit is "bare bones."  D.E. 74-1 at 5.  The Sixth Circuit has described what makes up a bare-bones affidavit:

> An affidavit that is so lacking in indicia of probable cause that no reasonable officer would rely on the warrant has come to be known as a "bare bones" affidavit.  A bare-bones affidavit, in turn, is commonly defined as one that states only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge."  Put more simply, a bare-bones affidavit is a conclusory affidavit, one that asserts "only the affiant's belief that probable cause existed."  It provides nothing more than a mere "guess that contraband or evidence of a crime would be found," either "completely devoid" of facts to support the affiant's judgment that probable cause exists, or "so vague as to be conclusory or meaningless."

> In contrast, an affidavit is not bare bones if, although falling short of the probable-cause standard, it contains "a minimally sufficient nexus between the illegal activity and the place to be searched."  If the reviewing court is "able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been"—"some modicum of evidence, however slight"—"between the criminal activity at issue and the place to be searched," then the affidavit is not bare bones and official reliance on it is reasonable.

> A bare-bones affidavit should not be confused with one that lacks probable cause.  An affidavit cannot be labeled "bare bones" simply because it lacks the requisite facts and inferences to sustain the magistrate's probable-cause finding; rather, it must be *so* lacking in indicia of probable cause that, despite a judicial officer having issued a warrant, *no* reasonable officer would rely on it.  The distinction is not merely semantical.  There must be daylight between the "bare-bones" and "substantial basis" standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function.  Only when law enforcement officials operate in "'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights" will the "heavy toll" of suppression "pay

its way."  Otherwise, "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful," excluding evidence recovered as a result of a technically deficient affidavit serves no useful purpose under the exclusionary rule.  We must therefore find that the defects in an affidavit are apparent in the eyes of a reasonable official before faulting an executive official for complying with his or her duty to execute a court-issued order.

*United States v. White*, 874 F.3d 490, 496-97 (6th Cir. 2017) (citations omitted).

Despite its failure to sufficiently connect the drug crimes and Facebook account #100010269126319, the affidavit does contain important factual information.  We know the affidavit was created by an officer with 16 years of experience.  We know about the March 12, 2019 drug buy between Marroquin and a confidential informant.  The affidavit further states, "It was discovered prior to the illegal drug transaction that the suspect has used and continues to use Facebook messenger as a form of communication to arrange these types of drug transactions."  Because the phrase "[i]t was discovered" is unaccompanied by any specific factual foundation, the affidavit was insufficient for a magistrate to make an independent finding of an adequate nexus.  However, the otherwise unspecified "discover[y]" is enough for a reasonable officer to believe that the judge-issued warrant was valid.  Further, a second sentence in the affidavit also links the drug conspiracy to the Facebook accounts:  "Rebecca Lannan and Timothy Marroquin . . .  are believed to be using Facebook messenger as a means to communicate to one another when arranging drug deals, and further their illegal drug trafficking business."  D.E. 74-2 at 2.  The affidavit cites both a "discover[y]" and a "belie[f]" linking the drugs to the accounts.  While not enough for an independent determination of probable cause, these statements suffice for the good-faith exception.  A reasonable officer could have believed that the affidavit implicitly identified the Facebook account as either Lannan's or Marroquin's.  The affidavit's facts establish a "minimally sufficient nexus between the illegal activity and the place to be searched." *United*

*States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016) (quoting *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en banc)).

This case is similar to *Whitt*, where the reviewing court found probable cause lacking because the affidavit failed to take the necessary "step" of linking the crimes to the targeted Facebook account. But the court found that "[e]ven if hindsight shows that the requisite nexus was lacking . . ., it was not unreasonable for law enforcement to rely on the warrant at the time." *United States v. Whitt*, No. 1:17-CR-60, 2018 WL 447586, at *4 (S.D. Ohio Jan. 17, 2018).

This case also resembles *Propps*. In that case, the affidavit established that members of a gang used a particular Facebook group to plan criminal activity. But the affidavit to search the target account failed to allege that the target account was one of the gang-member accounts that did this. *United States v. Propps*, No. 4:18-CR-03, 2019 WL 668465, at *3 (N.D. Ga. Feb. 19, 2019) (finding the affiant provided "no link—through the fruits of his investigation or his own experience—to say that this particular person, even if a member of the gang, used his Facebook account like other members did"). Nevertheless, the court denied the motion to suppress under the good-faith exception:

> There is no evidence [the affiant] intentionally or recklessly misled the issuing magistrate judge. There also is no basis to find the magistrate judge abandoned his "judicial role" in issuing the warrant. And while the Court finds the affidavit ultimately insufficient, it was not so lacking in indicia of reliability that no reasonable agent could have believed it valid. . . . And finally, no one claims the warrant itself was so facially deficient that the executing officers could not have presumed it to be valid. Even if probable cause did not exist to support the issuance of the warrant, suppression is inappropriate.

*Id.* at *4-5. In this case, as in *Higgins*,

> there is no evidence that any circumstances are present that would negate the good-faith exception. There is no evidence that [Det. Greene] included false information in the affidavit; there is no evidence that the magistrate acted as a partisan rubber stamp; the affidavit . . . is not bare bones, and this court's precedents are not so clear as to make it "entirely unreasonable" to find probable cause based on such an

12

affidavit; and there has been no showing that the warrant was so obviously deficient that official reliance on it was objectively unreasonable.

*Higgins*, 557 F.3d at 391.  Although the warrant was invalid for lack of probable cause to search the specific Facebook account, there was no police misconduct here, much less flagrant misconduct.  The officers executing the warrant did so in good faith.  Suppression would be inappropriate.

## IV.  Fruit of the Poisonous Tree

The exclusionary rule encompasses both the "primary evidence" obtained as a direct result of an illegal search and later-discovered evidence that is "derivative of an illegality," the so-called "fruit of the poisonous tree."  *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).  As noted, Marroquin seeks to apply the fruit-of-the-poisonous-tree rule to suppress the subsequent search of Lannan's residence as well the testimony of "Witness X" and "Witness Z."  D.E. 157 at 3.

Here, however, because the information obtained through the Facebook warrant is admissible under the good-faith exception, the "fruits" of that search are not subject to suppression.  *See United States v. Powell*, 943 F. Supp. 2d 759, 784 (E.D. Mich. 2013), *aff'd*, 847 F.3d 760 (6th Cir. 2017) (finding that suppression under the "fruit of the poisonous tree doctrine" would be improper when the original warrant fit the good-faith exception).  As District Judge Wier recently opined:

> excluding fruits of a good-faith search (one upheld despite warrant invalidity) would be wholly inconsistent with the principles undergirding the good-faith exception and the purposes of the exclusionary rule.  *See United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010) ("[T]he Supreme Court has [ ] emphasized that the decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred."); *United States v. McClain*, 444 F.3d 556, 566 (6th Cir. 2005) ("Because the officers who sought and executed the search warrants acted with good faith, and because the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable, we conclude that despite the initial Fourth Amendment violation, the *Leon* exception bars application of the

13

exclusionary rule" to the subsequent search.).  Suppressing direct products of an invalid warrant executed in good faith does not (as *Leon* held) justifiably vindicate the deterrence interests that animate the remedy.  The Court sees no reasoned basis for finding any increased likelihood of discouraging misconduct via exclusion of fruits more logically and factually detached—particularly when, as here, there is no suggestion of impropriety linked to the later-acquired proof.

*United States v. Glennis Kody Nantz*, No. 6:20-CR-02-REW-HAI, D.E. 230 at 3 n.4 (E.D. Ky. June 11, 2020).  For the same reasons, exclusion under the fruit-of-the-poisonous-tree doctrine is not available in this case.  The undersigned accordingly recommends that **no evidence** be suppressed in this case.  The analyses that follows are offered solely in the alternative.

### V. Residential Search Warrant

Even if the fruits of the Facebook search were to be suppressed, the warrant affidavit for the search of Lannan's residence still contained adequate independent facts to establish probable cause.  The factual portion of the affidavit states:

> On May 8, 2019 I conducted a controlled undercover drug transaction utilizing a Kentucky State Police confidential informant which purchased approximately 3oz of suspected crystal methamphetamine from Timothy Marroquin inside above described residence in Pineville KY 40977 for the purchase price of $1800.00 (Kentucky State Police buy money)[.] During the transaction surveillance was maintained by detectives.  Reference case # 10-19-0207[.]

> Acting on the information received, Affiant conducted the following independent investigation:

> Through surveillance of the residence and qualified confidential informant statements that have notified detectives that Becky Little and Timothy Marroquin hold large amounts of crystal methamphetamines and large amounts of U.S. currency.  **Through social media conversations it has been revealed that the residence is used to store and traffic narcotics throughout the surrounding area.**

> Through training, experience **and knowledge** it is believed that Becky Littles, and Timothy Marroquin store large amounts of narcotics and money at this residence.

D.E. 95-1 at 4 (emphasis added).

14

Marroquin argues that the words quoted above in bold type should be stricken as fruit of the poisonous tree.  D.E. 157 at 4.  If the application for a warrant "contains probable cause apart from the improper information," then the warrant is lawful.  *United States v. Jenkins*, 396 F.3d 751, 758 (6th Cir. 2005).

It was made clear at the evidentiary hearing that the "social media" conversations referenced in the residence warrant are Facebook Messenger conversations between Lannan and Marroquin found in Marroquin's Facebook account.   Rec. at 00:20:17-00:21:14, 00:38:22-00:38:43.  As Det. Greene testified, these conversations described how Lannan's residence was being used in the trafficking conspiracy, including conversations about buying safes to store money and methamphetamine.  *Id*.  If the Facebook search was not covered by the good faith exception, this reference to "social media conversations" should be stricken.  The same goes for the reference to "knowledge," since Det. Greene was apparently referring to his knowledge of the Facebook Messenger conversations.

With these portions stricken, the affidavit contains the following facts which potentially contribute to a finding of probable cause:

(1)      The affiant used a confidential informant to conduct a recent controlled purchase of $1800 in crystal meth from Marroquin at the residence.  Detectives maintained "surveillance" during this purchase.

(2)      Unspecified "surveillance" has led "detectives" to believe that Marroquin and Lannan "h[e]ld" large amounts of crystal meth and currency, presumably, in context, at the residence.

(3)    Unspecified "qualified confidential informant statements" also led "detectives" to believe that Marroquin and Lannan "h[e]ld" large amounts of crystal meth and currency, presumably, in context, at the residence.

(4)    The affiant's training and experience also led him to believe that Marroquin and Lannan "store large amounts of narcotics and money at this residence."

Applying the legal standards quoted in Part II.A above, the above facts establish probable cause to search the residence, including an adequate nexus. This analysis begins with "great deference" toward the issuing judge's probable cause determination. *United States v. Abernathy*, 843 F.3d 243, 250 (6th Cir. 2016). Reading the affidavit "in a commonsense, rather than hypertechnical manner," *Greene*, 250 F.3d at 479, the state judge had a "substantial basis" for finding the affidavit established probable cause, *United States v. Braden*, 248 F. App'x 700, 702 (6th Cir. 2007).

The controlled drug buy alone provided reasonable grounds to believe that evidence of drug trafficking would be found at the residence. The purchase was orchestrated and surveilled by detectives. Money was given in return for drugs. The purchase occurred at the residence itself. Thus, there is no real question of a lack of nexus between the trafficking and the target location.

Although the remaining facts in the affidavit are vague, they serve to strengthen the probable cause which results from the factual description of the controlled purchase. For example, an issuing judge "may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 644 (6th Cir. 2003) (quoting *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996)); *see also United States v. Melton*, No. 6:18-CR-48-REW-HAI, 2019 WL 1521979, at *4 n.5 (E.D.

16

Ky. Apr. 8, 2019). The issuing judge in this case could therefore have relied upon the affiant's opinion based on his "training and experience" as enhancing the strength of the affidavit's facts, which include the facts of the controlled buy and the otherwise unspecified "surveillance" and statements by confidential informants.

Marroquin's arguments concerning the affidavit give scant mention of the fact that a controlled, surveilled drug purchase from Marroquin was conducted at the residence itself. D.E. 97 at 4-9. This fact separates this case from the cases Marroquin cites in support of his argument. *See id*. Therefore, even if the identified portions of the affidavit were excised, the affidavit establishes probable cause to search the residence. Suppression is not warranted.

Further, even if the affidavit lacked probable cause sans references to social media conversations, the warrant passes muster under the good-faith exception. The affidavit to search the residence is not "so lacking in indicia of probable cause that no reasonable officer would rely on the warrant;" it is not a "bare bones" affidavit. *United States v. White*, 874 F.3d 490, 496-97 (6th Cir. 2017). The description of the controlled buy is enough for a reasonable officer to believe evidence of drug trafficking would be found at the residence, even if a judge would not reach the same conclusion. Because this Court can "identify in the averring officer's affidavit *some* connection . . . between the criminal activity at issue and the place to be searched," official reliance on it was reasonable. *Id.* The residential search is not subject to suppression, nor are any of the fruits thereof.

## VI.  Witnesses X and Z

Witnesses X and Z are known to defense counsel, and witness X is a codefendant. D.E. 157 at 5. As previously explained, the undersigned recommends that no information in this case be suppressed. Although the Facebook warrant was invalid, it satisfies the good-faith exception,

so there is no need to suppress additional evidence derived from the fruits of that Facebook search. The following analysis is offered solely in the alternative, and relies on testimony from the evidentiary hearing.

The government bears the burden of proving one of the exceptions to the fruit-of-the-poisonous-tree doctrine, *i.e.*, independent source, attenuation, or inevitable discovery. *See United States v. Leake*, 95 F.3d 409, 417 (6th Cir. 1996). The government relies primarily on the independent-source rule. D.E. 156 at 2 ("[T]he United States maintains that there are no witnesses derived from the Facebook materials in question.").

Even when a Fourth Amendment violation occurs, the government may still use "knowledge . . . gained from an independent source" against the accused. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).

> The interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position that they would have been in if no police error or misconduct had occurred. . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Murray v. United States*, 487 U.S. 533, 537 (1988) (quoting *Nix v. Williams,* 467 U.S. 431, 443 (1984)). The independent-source rule encompasses "*all* evidence acquired in a fashion untainted by the illegal evidence-gathering activity." at 537-38. The rule applies even "to evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Id.* at 537.

> In evaluating whether evidence should be admitted under either the independent source or the inevitable discovery doctrines, courts should keep in mind the underlying question: "whether, granting establishment of the primary illegality, the evidence has been come at by the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Leake*, 95 F.3d at 412 (citation omitted).

18

The first witness at the evidentiary was KSP Det. Brian Greene, the affiant for the Facebook and residence warrants. The second was DEA Special Agent Ian Dalrymple, who was already investigating Lannan's alleged source of supply, Lucas Maiden, before the KSP investigation began. Det. Greene was not involved with Witnesses X and Z. However, Det. Greene did describe a series of controlled purchases from Lannan and/or Marroquin that occurred after the Facebook search on May 1, May 8, and May 16, 2020. Rec. at 00:13:44-00:19:33. These controlled purchases were performed by an informant who was introduced to the KSP by task force officers in Virginia (*i.e.*, he could not have been derived from the Facebook search). Rec. at 00:13:44-00:14:53.

At the evidentiary hearing, Agent Dalrymple was asked, "Are you aware of any witnesses or potential witnesses in this case that the DEA has developed or investigated that were derived from the search warrants that [Det. Greene] did on the Facebook accounts for Mr. Marroquin or Ms. Littles?" The agent answered, "No, sir, as far as I'm aware, DEA did not create or develop any confidential sources from any of the information that was in the Facebook searches." Rec. at 00:51:45-00:52:23.

Agent Dalrymple explained that the "primary focus" of his investigation was Lucas Maiden, Lannan's source of supply. Rec. at 00:44:18-00:44:35. Dalrymple learned in November 2018 that Maiden was a "multi-kilogram supplier" of meth. Rec. at 00:44:48-00:45:09. Dalrymple's investigation was jeopardized, however, when Maiden wrecked his car in Tennessee on February 28, 2019, and was arrested by local authorities. Rec. at 00:45:20-00:46:05.

Maiden was subsequently interviewed on March 13, 2019. He identified Lannan as one of his biggest customers. Rec. at 00:46:15-00:46:27, 00:47:51-00:48:28. When asked whether Maiden mentioned Marroquin by name, Agent Dalrymple testified he did not, but Maiden said that

"Ms. Littles came up from time to time with other people, but he didn't know who they were." Rec. at 01:12:17-01:12:41.  During the March 2019 interview, Maiden allowed investigators to search his cellphone, including his Facebook account.  Investigators at the March interview did not find anything about Lannan or Marroquin in this preliminary phone inspection.  Rec. at 00:46:30-00:47:13, 00:53:40-00:54:30.  Agent Dalrymple said he could not remember when Marroquin first came to his attention. Rec. at 01:12:44-01:13:25.  Little and Marroquin just "kept popping up over and over again" from various sources during the investigation.  *Id.*

The DEA obtained warrants for the Facebook accounts of Maiden and several co-conspirators (not including Lannan and Marroquin) around the time of the search of Lannan's residence, and Dalrymple received the Maiden-related information from Facebook in mid- to late-May 2019.  *Id.*; Rec. at 00:50:10-00:50:40.  This Facebook data included conversations involving Lannan.  Rec. at 01:05:21-01:05:44.

Dalrymple explained he was not coordinating or involved in Det. Greene's investigation. Dalrymple knew Greene's team was investigating Lannan and doing controlled buys.  However, Dalrymple was trying to go up the Maiden supply chain, whereas Lannan and Marroquin were downstream.  Dalrymple testified he did not tell Greene about Maiden's proffer interview prior to the search of Lannan's residence.  Rec. at 01:01:42-01:03:33.

As for the information Greene obtained from Marroquin's Facebook account, Dalrymple was not sure when he first viewed it.  Rec. at 00:50:39-00:50:54.  He testified he "skimmed through" this material at some point in 2019.  Rec. at 01:03:38-01:04:19, 01:13:30-01:14:17. Dalrymple testified that, during this period, his focus was on salvaging the investigation of Maiden following his car wreck and arrest.  Rec. at 01:03:38-01:04:19.  Dalrymple testified that when he

interviewed suspects and potential witnesses, he relied on his own investigative materials and did not take Greene's search warrant materials to those interviews.  Rec. at 01:06:22-01:07:25.

The DEA interviewed Witness X on January 14, 2020.  The written record of that interview (DEA-6)[6] contains references to Marroquin.  Dalrymple did not recall how Marroquin's name came up, though he said interviewers would generally provide the interview subject with a name, ask if they know that person, and allow the subject to "expand upon that."  Rec. at 01:23:27-01:24:20.

The DEA interviewed Witness Z on February 28, 2020.  The written record of that interview (DEA-6) also contains references to Marroquin, with no dates indicated for Marroquin's interactions with Witness Z.  Dalrymple did not recall what questions Witness Z may have been asked about Marroquin.  Rec. at 01:25:10-01:25:44.

On redirect, Dalrymple was asked whether his investigation into Marroquin was based solely on Greene's Facebook search warrant.  Dalrymple answered no and said the names of the various suspects appeared from various places, including Maiden, who sold to Lannan.  Dalrymple said his interest in Marroquin was derived entirely from Marroquin's connection to Lannan, who was identified through several sources as a large-scale meth distributor.  Rec. at 01:27:02-01:28:26.

Assuming that fruits of the Facebook search are subject to suppression, has the government met its burden of proving Witnesses X and Z were discovered independently of the Facebook search and that their statements about Marroquin were not solicited based on the contents of the Facebook search?  Agent Dalrymple was asked, "Are you aware of any witnesses or potential witnesses in this case that the DEA has developed or investigated that were derived from the search

---

[6] The DEA-6 reports for Witnesses X and Z are not in the record of this case.

warrants that [Det. Greene] did on the Facebook accounts for Mr. Marroquin or Ms. Littles?"  The agent answered, "No, sir, as far as I'm aware, DEA did not create or develop any confidential sources from any of the information that was in the Facebook searches."  Rec. at 00:51:45-00:52:23.  The answer is somewhat unclear in that it references "confidential sources" while the question was about "witnesses."  No evidence was offered indicating that Witnesses X and Z *were* derived in some manner from the Facebook search.  The defense points out that Dalrymple did not recall when he saw Marroquin's Facebook materials other than some time in 2019, and implies these materials could have included some reference to Witnesses X and Z or else prompted Dalrymple to question the witnesses about Marroquin.  D.E. 157 at 5.  The defense also points out that Dalrymple did not remember how Marroquin's name came up in his questioning of Witnesses X and Z.  *Id*.  The defense argues that this case is like *Leake* and the witnesses should be suppressed.  *Id*. at 6.

The independent-source question here ultimately turns on the burden of proof.  Agent Dalrymple simply did not remember the key facts as to whether Witnesses X and Z and their statements about Marroquin were derived independently from Marroquin's Facebook materials.  He did not remember what questions he asked these witnesses that prompted them to talk about Marroquin.  Dalrymple had seen these highly incriminating documents prior to the interviews of Witnesses X and Z.  He was unable to identify any other background to his questions to them about Marroquin except in the vaguest terms.  Assuming that the Marroquin Facebook materials are subject to suppression, the government has not met its burden of proving an independent source for the information from Witnesses X and Z.  But one more question remains.

The final issue is whether the information from Witnesses X and Z is attenuated from any illegal search of Marroquin's Facebook account.  The exclusionary rule "prohibits the introduction

of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (citation omitted).

> The test for attenuation is whether the evidence sought to be introduced has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. The Supreme Court has set forth three factors to guide this inquiry: (i) the temporal proximity of the [constitutional violation] and the emergence of the incriminating evidence at issue, (ii) the existence of intervening circumstances, and (iii) the purpose and flagrancy of the official misconduct.

*United States v. Mills*, 372 F. Supp. 3d 517, 537 (E.D. Mich. 2019) (citations omitted). For the first factor, here, the interviews occurred in January and February of 2020, ten or eleven months after the (hypothetically) illegal search of Marroquin's Facebook account (the Court does not find that the search of Lannan's residence violated the Constitution). This is a significant period of time during which the DEA continued its investigation that led to the interviews of Witnesses X and Z. If anything, this factor favors attenuation.

As for intervening circumstances, the circumstances in this case include:

(1)     The DEA's warrant-based search of the Facebook accounts of Maiden and some co-conspirators in May 2019.

(2)     A DEA/Knox County Sheriff's controlled buy from Lannan at Lannan's residence on April 18, 2019, as described by Agent Dalrymple. Rec. at 00:49:08-00:50:09.

(3)     A KSP controlled buy at Lannan's residence involving Marroquin on May 1, 2019, using the informant identified by a task force officer from Virginia. Rec. at 00:13:44-00:16:02.

(4)    A KSP controlled buy at Lannan's residence involving Marroquin on May 8, 2019, using the Virginia informant.  Rec. at 00:16:03-00:17:38

(5)    A KSP controlled buy involving Marroquin at a car wash in Pineville on May 13, 2020.  Rec. at 00:18:14-00:19:33

Each of these events contains the potential to dispel the taint of the hypothetically illegal search of Marroquin's Facebook account in March 2019.  If anything, intervening circumstances weigh slightly in favor of attenuation.

The most important attenuation factor in this case is the third.  The exclusionary rule exists to deter police misconduct and the third factor of the attenuation doctrine "reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant."  *Utah v. Strieff*, 136 S. Ct. 2056, 2063 (2016).  There is no hint of law enforcement misconduct in this case..  As in *Strieff*, there is "no indication . . . of any systemic or recurrent police misconduct."  *Id*.  As in *Strieff*, the error of Det. Greene submitting an affidavit that failed to include an adequate nexus to Marroquin's Facebook account was "an isolated instance of negligence that occurred in connection with a bona fide investigation of a suspected drug house."  *Id*.  The lack of intentional misconduct counsels strongly against suppression of Witnesses X and Z as fruit of the poisonous tree.  The attenuation factors weigh in favor of finding attenuation and against suppression of Witnesses X and Z.

## VII.  Conclusion

For the reasons discussed above, the undersigned **RECOMMENDS** that Defendant's motion to suppress (D.E. 77) be **DENIED.**  The Court finds that, although the Facebook warrant lacked an adequate nexus to Marroquin's account, suppression is unwarranted under the good-faith exception.  Even if that exception did not apply, the subsequent residential warrant was still

24

supported by probable cause.  Further, even if the good-faith exception did not apply, the testimony of Witnesses X and Z would be saved by the attenuation doctrine.

The Court also **HEREBY ORDERS** that Marroquin's motion to strike (D.E 101) is **DENIED** as withdrawn.  *See* D.E. 157 at 1.

**IT IS FURTHER ORDERED THAT** Marroquin's motion for disclosure (D.E. 92) is **DENIED.**  Much additional evidence has been disclosed since the filing of that motion, and to the extent Marroquin seeks additional disclosure, the motion is mooted by his stated reasons. Marroquin requested disclosure in order to "facilitate before trial a determination of which of this evidence if any should be suppressed as the fruit of the deficient search warrant issued by the Bell District Court and the unconstitutional seizure of Marroquin's Facebook Messenger correspondence." *Id.*  Because the Court has determined that no evidence related to the Facebook search warrant should be suppressed, the motion is moot.

The Court issues its Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the Orders herein pursuant to 28 U.S.C. § 636(b)(1)(A).  The parties should consult that statute and Federal Rule of Criminal Procedure 59(b) concerning the right to appeal to the District Judge. Any objection must be filed within **fourteen days** of the entry of this order.  Failure to object per Rule 59(b) waives a party's right to review.  Upon expiration of that fourteen-day period, the Recommended Disposition  will be submitted to Judge Boom for her consideration.

This the 10th day of July, 2020.

**Signed By:**

***Hanly A. Ingram***

**United States Magistrate Judge**